# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JEROME, Minors.

UNPUBLISHED
June 12, 2018

No. 338343
St. Clair Circuit Court
Family Division
LC No. 13-000269-NA

Before: SWARTZLE, P.J., and SHAPIRO and BOONSTRA, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to his minor children, AJ and TJ, under MCL 712A.19b(3)(g) (failure to provide proper care and custody) and (j) (reasonable likelihood that child will be harmed if returned to parent). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In October 2013, the children's biological mother, Andrena Miller-Brown, called petitioner, the Department of Health and Human Services (DHHS), and requested that DHHS take custody of the children, stating that she could no longer care for them. DHHS filed a petition seeking to have the trial court take jurisdiction over the children and remove them from Miller-Brown's care. The petition alleged that, according to Miller-Brown, the children could not be placed with respondent because he was then hospitalized for a medical condition that caused seizures. After the filing of the petition, the trial court entered an order taking the children into protective custody.

The following day, a preliminary hearing was held on the petition. Respondent could not be located and was not present at the hearing. Miller-Brown pleaded to the allegations in the petition, consented to the trial court's jurisdiction, and voluntarily released her parental rights. The trial court authorized the petition.

Later in October 2013, a dispositional review hearing was held. Respondent had been located and was working with Lutheran Social Services Representative Nicole Reinhart. Reinhart testified that respondent was unemployed, was seeking disability benefits, and was being evaluated medically for either seizures or a heart condition. Reinhart also testified that DHHS was investigating an allegation that respondent had physically abused both children. The trial court entered an order consistent with Reinhart's recommendations that required respondent

to obtain stable employment and participate in various services, including random drug screens, counseling, and parenting classes. Respondent was granted supervised parenting time.

Over the next two years, respondent intermittently participated in services. Respondent occasionally obtained employment but frequently quit or lost jobs after only a few weeks. Respondent would generally obtain employment immediately before a review hearing, but lose it shortly thereafter. Respondent generally attended random drug screens and tested negative; although respondent missed some screens and occasionally tested positive for opiates, he had been prescribed narcotic medication for ongoing medical issues, which Reinhart testified could have accounted for the positive results. Respondent eventually completed a psychological evaluation in 2014 but failed to attend individual counselling or complete parenting classes. Respondent was arrested in late 2013 for using a credit card that did not belong to him and was placed on probation.

For a brief time in 2015, respondent exercised unsupervised parenting time along with his live-in girlfriend, Nicole Shovan. Both a Lutheran Social Services representative and the children's foster mother testified to problems with the unsupervised visits, including that the children reported that Shovan and respondent would argue in front of the children, that Shovan had pulled on the children's arms and spit at them, that the children had not been placed in car seats while being transported and had instead been made to sit on the floor of the car, and that the children had seen respondent and Shovan slap each other. The foster mother additionally reported an incident in which TJ placed her finger in her own anus and asked another child to "smell it;" TJ reported that she had seen Shovan and respondent do the same thing to each other during visits. In response, the trial court again ordered supervised parenting time for respondent.

At a November 2015 hearing, and as a result of the issuance of *In re Sanders*, 495 Mich 394, 407; 852 NW2d 524 (2014), and the abolishment of the "one parent doctrine," the trial court and the parties discussed the need to adjudicate the trial court's jurisdiction over respondent. Respondent consented to the trial court's jurisdiction regarding the original petition, which did not seek the termination of his parental rights, and agreed to continue with court-ordered services.

Respondent continued to inconsistently participate in services throughout 2016. Respondent was sporadic in his communication with DHHS, had broken up with Shovan, and was variously living in his mother's, sister's, and friend's houses. The children's foster care worker, Ashley Sheetz, testified that the children were suffering from behavioral issues and were struggling in school. The lawyer-guardian ad litem (LGAL) for the children testified in August 2016 that AJ had asked her to tell the judge, "Don't let daddy hurt us," and that TJ had asked her to ask the judge, "To help [Shovan] not hurt me." AJ was diagnosed with post-traumatic stress disorder and adjustment disorder, while TJ suffered from night terrors and daytime and nighttime enuresis.

In November 2016, a supplemental petition was filed and authorized. The supplemental petition sought the termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j), and focused primarily on respondent's inconsistent participation in, and lack of benefit from, services, his continuous inability to maintain employment, and behavioral and mental health issues that the children were experiencing.

A termination hearing was scheduled to occur in December 2016; however, the trial court determined that the original 2013 petition (as to which respondent had consented to jurisdiction in November 2015) did not set forth any specific allegations against respondent other than a brief statement by Miller-Brown stating that "Mr. Jerome is not a suitable placement for the children," and that "he's currently in the hospital in Detroit for brain seizures." The trial court reasoned that, despite respondent's expression of consent, it lacked proper jurisdiction over respondent under *Sanders* so as to terminate his parental rights. The trial court therefore dismissed the supplemental petition and directed DHHS to file a new petition against respondent seeking termination at the original disposition.

DHHS filed such a petition in December 2016. An adjudication jury trial was held in February 2017; the jury found that the trial court's assumption of jurisdiction was proper. A termination hearing was held on April 11, 2017. The trial court found that the termination of respondent's rights was proper under MCL 712A.19b(3)(g) and (j) and in the children's best interests. This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred by holding that DHHS had proven at least one statutory ground for termination by clear and convincing evidence. We disagree.

We review for clear error a trial court's factual findings "as well as its ultimate determination that a statutory ground for termination of parental rights has been proved by clear and convincing evidence." MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

The trial court found by clear and convincing evidence that respondent's rights should be terminated under MCL 712A.19b(3)(g) and (j). In relevant part, MCL 712A.19b(3) authorizes a court to terminate parental rights if it finds by clear and convincing evidence that one of the following circumstances exist:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> *   *   *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

"Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence

-3-

under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). "While [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

Regarding subsection (3)(g), the trial court did not clearly err when it concluded that respondent was unable to provide proper care and custody for his children, and that there was no reasonable expectation that he would be able to do so within a reasonable time considering the age of the children. "[A] parent's failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child." *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003). Further, it is not enough to merely participate in services; a parent must also benefit from the services provided. *Frey*, 297 Mich App at 248.

When the original petition was filed, respondent was hospitalized for a medical condition. Even after his release from the hospital, respondent was initially fairly uninvolved in the proceedings as Miller-Brown released her parental rights and the children were removed from her care. At some point, respondent began showing interest in reunifying with the children. However, he still substantially failed to comply with or benefit from the parent-agency agreement. Respondent was required to maintain stable employment, which the trial court emphasized throughout the entirety of the proceedings. Respondent was given the assistance of Michigan Rehabilitative Services (MRS), but failed to benefit from the service, even failing to attend a meeting with MRS workers designed to assist him with his attendance problems. Respondent did obtain many jobs, but would either be fired due to poor attendance, have the job end due to its temporary nature without securing another job, or quit a job based on the hope for a "better" job that often was never forthcoming.

Respondent also failed to maintain stable housing as required by the trial court. In 2013, respondent lived initially with his mother, but he was forced to leave her home after he received a felony conviction. He then moved into a friend's house and later moved in with his sister. Respondent lived with Shovan in government-assisted housing until they broke up, at which time he began to split his time between his mother's, sister's, and friend's house. DHHS attempted to review each of these living situations for their suitability as a home for the children, but respondent canceled every appointment.

Additionally, respondent failed to meaningfully engage in counseling services. Although respondent eventually completed a psychological evaluation (after numerous missed appointments) and was referred to counseling several times, each referral was cancelled after respondent repeatedly failed to show up for his sessions.

Licensed Counselor Rachel Krupa treated both respondent (before his service was cancelled for non-attendance) and the children. Krupa assessed respondent as having attention deficit disorder. Respondent's attendance was inconsistent with Krupa as well, and he missed all his appointments in a two-month period. According to Krupa, respondent told her that he missed the appointments because he either had lost his job or was sick. Krupa also explained that respondent had challenges surrounding the "multitasking" necessary for proper parenting. Krupa testified that respondent showed "a lack of follow through," which, as she explained, was supported by his inability to maintain employment and housing. Krupa also testified, contrary to

the experts' diagnoses of the children's mental health issues, that respondent did not believe that his children suffered from any illness. Relatedly, Sheetz made an appointment with respondent to discuss the children's mental health evaluations; however, he got "very angry" about it and failed to show up to discuss them. A subsequent meeting was scheduled, but again, respondent failed to attend.

In addition to counseling, respondent received a referral for life skills coaching. Respondent also missed many appointments with his life skills worker, failed to return calls or text messages, and repeatedly changed his telephone number. Respondent's failure to participate in life skills coaching eventually caused this service to be terminated. Respondent similarly and regularly failed to attend parenting classes throughout the pendency of the proceedings, although Sheetz did report in 2017 that respondent had completed a six-week parenting class.

During much of the pendency of the case, respondent was provided with parenting time with his children. Initially, visits were supervised. Then, for a short period of time, visitations with the children were unsupervised; however, the trial court again ordered supervised visits after numerous issues arose. Krupa observed approximately eight visitations between respondent and his children. Respondent generally interacted with the children appropriately, and the children appeared happy to see respondent and were "bonded" with him. However, Krupa stated that for about half of the parenting time visits that she supervised, respondent was unprepared because he did not bring items such as food and wipes. Respondent also missed several parenting time appointments and, although he originally had asked to attend the children's doctor visits, missed three of them and left early during another one.

The record contains substantial evidence of respondent's inability, over a period of two years, to participate in and benefit from services and comply with his parent-agency plan, as well as his inability to maintain stability in any aspect of his life, much less in the areas of employment and housing. *JK*, 468 Mich at 214; *Frey*, 297 Mich App at 248. Accordingly, the trial court did not err by holding that termination was proper under MCL 712A.19b(3)(g). See *Mason*, 486 Mich at 152.

The trial court also did not clearly err when it found that returning the children to respondent may result in a reasonable likelihood of harm. For purposes of MCL 712A.19b(3)(j), "harm" includes both physical and emotional harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). Depriving a child of a normal home may contribute to emotional harm. *Id*. A parent's failure to comply with the terms and conditions of his or her service plan may be evidence that the child will be harmed if returned to the parent's home. *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

Here, respondent's failure to meaningfully engage in services is evidence that his children would be harmed if they were returned to him. *Id*. Sheetz testified that, in her opinion, respondent's inconsistency with services, and his inability to "multi-task or get things done on his own," put the children at risk because respondent would not be able to meet their needs or address their mental health and emotional issues. Further, the record reflects that the children reported domestic violence between respondent and Shovan during unsupervised visits—although respondent and Shovan were not together at the time of the termination hearing, the trial court could easily conclude that the children were at risk of witnessing such violence in

respondent's other relationships. The record shows that respondent denied that any domestic violence had occurred, denied that his children suffered from any mental health issues, and frequently refused to even attend meetings aimed at addressing these issues.

The trial court did not clearly err by determining that the children would likely be exposed to, at a minimum, significant emotional harm if returned to respondent's home. *Hudson*, 294 Mich App at 268. Accordingly, termination was proper under MCL 712A.19b(3)(j). See *Mason*, 486 Mich at 152.

### III. BEST INTERESTS

Respondent also argues that the termination of his parental rights was not in the best interests of his children. We disagree.

After a trial court has determined that at least one statutory ground for termination has been proven, it must order the termination of a parent's rights if it finds by a preponderance of the evidence that termination is in the children's best interests. MCL 712A.19b(5); *Moss*, 301 Mich App at 83. We review for clear error a trial court's decision that termination is in the children's best interests. *White*, 303 Mich App at 713.

"The trial court should weigh all the evidence available to determine the children's best interests." *Id*. In doing so, the trial court "should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality." *Id*. (quotation marks and citation omitted). In making this determination, a trial court's focus is on the child rather than the parent. *Moss*, 301 Mich App at 87-88. When there are multiple children involved, a trial court must address the best interests of each child individually if their interests are significantly different. *White*, 303 Mich App at 715. Even if a parent and child are bonded, termination may be in the children's best interests if there is a serious dispute regarding whether the parent has a healthy bond with the children. See *In re CR*, 250 Mich App 185, 196-197; 646 NW2d 506 (2001), overruled in part on other grounds by *In re Sanders*, 495 Mich 394, 422-423 (2014).

The trial court considered the best interests of the children. Specifically, the trial court correctly identified the children's need for stability, their past exposure to domestic violence, and their improved behavior as the case moved forward toward termination. Evidence was presented at trial, and at various times throughout the pendency of the case, that the children were bonded with respondent. However, significant evidence demonstrated that respondent's parenting ability, and the children's need for permanency, stability, and finality, greatly outweighed the benefit from any remaining bond. Respondent failed to demonstrate the ability to properly parent the children or place their needs above his own immediate desires. Despite knowing that employment was the critical remaining issue preventing reunification, he repeatedly accepted short-term work, and then would lose the work for various reasons, including poor attendance and the hope of finding better employment.

Additionally, respondent refused to entertain the idea that his children needed mental health treatment, believed that they should not be taking their prescribed medications, and refused to meet with various service providers regarding their mental health issues. Respondent

similarly refused to acknowledge that the children had witnessed any domestic violence. Respondent's refusal to even work to address these issues indicates that, despite any bond between respondent and the children, it would not be in their best interests to return to an unstable environment in which their mental health issues would go untreated and they were at risk of further emotional harm.

Further, if there is an overall "theme" to the evidence presented at trial, it is a lack of permanency, stability, and "follow-through" in respondent's life. This instability affected the children's mental health progress—when respondent was in the children's life, they regressed, and when respondent was not in their life, they showed improvement, such that both of the children were doing significantly better at the end of the proceedings. The children's pediatrician stated in a report admitted at the termination hearing that "continued interactions between the children and their father would only further escalate the mental health symptoms that they were both currently demonstrating." And Krupa testified that the long duration of this case had increased the children's mental health challenges.

Finally, Sheetz testified that AJ and TJ will only be adopted by a family who will accept both children, obviating concerns that the siblings would be split up. And Sheetz also testified that no further services were available that could assist respondent in becoming a fit parent.

In light of the children's need for stability, safety, and permanency, the trial court did not err by determining that termination was in the children's best interests, notwithstanding the fact that a bond may exist between respondent and the children. *CR*, 250 Mich App at 196-197; *White*, 303 Mich App at 713.

Affirmed.

/s/ Brock A. Swartzle
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra